

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NS:KMT/JRS  *271 Cadman Plaza East*
F#: 2020R00304  *Brooklyn, New York 11201*

July 29, 2020

By ECF

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Darrius Sutton
                  Magistrate Docket No. 20-563

Dear Judge Levy:

      The government respectfully submits this letter in support of the pretrial detention of the defendant Darrius Sutton. As set forth below, the defendant, a member of multiple violent street gangs, was arrested on July 29, 2020, after evading law enforcement for several days, pursuant to a complaint for a brazen shooting in broad daylight on April 20, 2020 in the vicinity of 375 Sheffield Avenue in East New York. Video footage of the shooting recorded by surveillance cameras in the area make clear that the shooting was a targeted attack in which the defendant intended to kill the victim. The victim was hit in his upper-left chest, right thigh and right wrist and his wounds were not fatal. The facts underlying the instant offense alone warrant detention in this case.

      In addition to the shooting underlying the instant offense, the defendant has participated in at least five other shootings in the past year (including a drive-by shooting committed while on pre-trial release from an attempted murder charge in New York State) and, in light of his violent history, there is no set of conditions that would ensure the safety of the community. Moreover, law enforcement executed a search warrant on the defendant's apartment in 333 Georgia Avenue early on July 23, 2020, and he was not present. Thereafter, the defendant evaded detection by law enforcement until officers of the New York City Police Department ("NYPD") arrested him this morning at 390 Georgia Avenue. When NYPD took the defendant into custody, he was attempting to flee by jumping out of the apartment's first floor window. The defendant's efforts to avoid detection and evade arrest, and the likelihood that he will face a significant sentence for his violent conduct, make clear that he is also a significant risk of flight. For these reasons, Sutton should be detained pending trial.

I.  Background

    a.  The Instant Charges: the April 20, 2020 Shooting

As set forth in the complaint, on April 20, 2020, the defendant possessed ammunition that traveled in interstate commerce when he shot and attempted to kill an individual in the vicinity of 375 Sheffield Avenue in Brooklyn, New York. Surveillance video of the shooting shows that the defendant ambushed the victim from behind. The defendant approached the victim a gun in his left hand, stopped a few feet behind the defendant, raised the gun to shoulder level and steadied it with both hands, and fired several shots at the victim's back. The victim was hit in his upper left chest, right thigh and right wrist. As the video of the shooting and the photographs below make clear, it was entirely fortuitous that the defendant was unsuccessful in his attempt to murder the victim.



As set forth in the complaint, surveillance video taken in and around 333 Georgia Avenue — the building in which the defendant lives — shows the defendant coming and going from the building in the hours prior to the shooting. Throughout the day prior to the shooting, the defendant wore the same clothes he wore during the shooting: a blue Calvin Klein baseball hat, a grey fleece or sweatshirt with a hood and black contrasting zippers, a black hooded jacket, grey slim-fitting sweatpants and white shoes.





Pursuant to a judicially authorized search warrant of Facebook accounts associated with the defendant, the government has seized several photographs of the defendant posted approximately three weeks before the shooting in which the defendant can be seen wearing the same grey fleece, grey sweatpants and white athletic shoes he wore at the time of the shooting.



The attack was premeditated and appears to have been coordinated with others. When, on April 20, 2020, the defendant left 333 Georgia Avenue for the final time before the shooting, at about 3:05 p.m., video surveillance shows that he walked north towards Sutter Avenue, turned right in the direction of Sheffield Avenue to cut through a parking lot, and then turned south on Sheffield Avenue, headed in the direction of Blake Avenue. When the defendant reached Sheffield Avenue, he began to run towards Blake Avenue. At the time the defendant began to run, the victim is not visible in the video and the defendant was nearly a full block away from where the shooting occurred, confirming that the victim was an intentional target and strongly suggesting that one or more coconspirators informed the defendant of the victim's location prior to the shooting.

After the shooting, the defendant fled towards Blake Avenue. Video surveillance shows the defendant leaving 398 Sheffield Avenue shortly thereafter wearing a sweatshirt with stars on the arms. The defendant then walked back to 333 Georgia Avenue where he remained in front of the building for several minutes, before changing again into a sweatshirt with "E4D" printed on the front.

After the shooting, officers of the New York City Police Department ("NYPD") responded to the vicinity of 375 Sheffield Avenue and located shell casings from one 9mm Luger caliber Federal Cartridge cartridge and one .380 auto caliber Winchester cartridge. The NYPD Police Laboratory has analyzed these shell casings and determined that they were fired from the same gun.

Law enforcement subsequently recovered the star sweatshirt, the E4D sweatshirt and eight rounds of .38 special ammunition (among other items) from the defendant's apartment at 333 Georgia Avenue in the course of a judicially authorized search on July 23, 2020.

b. The Defendant's Other Shootings

Since August 11, 2019, the defendant has been involved in at least five other shootings, at least four of which appear to be gang-related. The government's investigation of these and other incidents is ongoing.

i. The Defendant's Gang Membership

The defendant's membership in the Bloods street gang dates back to at least 2016. Pursuant to a judicially authorized search of Facebook accounts associated with the defendant, the government has reviewed Facebook posts and photographs in which the defendant acknowledges his membership in the Bloods. For example, the defendant's Facebook account with the username "blizz.meecho.9" (the "Blizz Facebook Account") contains a post dated May 5, 2016 with an image of the defendant making a hand gesture in which he forms a "b" by joining his first finger and thumb and extending his other fingers.[1] The image is accompanied by the caption "Throw it up blood." "To throw" a gang sign is to make a hand gesture indicating gang membership, and in this image the defendant was "throwing" a hand gesture indicating his membership in the Bloods. On May 1, 2020, on the defendant's Facebook account with username "E4DMeecho" (the "E4DMEecho Facebook Account"), Sutton posted "F A L A Y O O O O O" and two Gorilla emojis.[2] "Falayo" is a gang call for the Gorilla Stone "set," or subgroup, of the Bloods street gang and members of the Gorilla Stone Bloods use the gorilla emoji to indicate membership in that set.[3] On April

---

[1] The header of the Blizz Facebook Account contains a photograph of SUTTON, and the page contains 38 publicly available video posts, all of which feature SUTTON speaking to the camera by himself or with others. Furthermore, the Blizz Facebook Account has on its front page a "Life Events" box that indicates the user "Started New Job at The Bamaz" on "March 28, 1996." I am aware from SUTTON's criminal history and other law enforcement databases that March 28, 1997 is SUTTON's birthday.

[2] The subscriber information for the "E4DMeecho" account indicates that the account is associated with a user named "Darrius Sutton," the header of the publicly available portion of this Facebook page contains a photograph of SUTTON and the name "Darrius Sutton (Blizz Meecho)", and there are numerous posts containing photographs of SUTTON and Facebook "live" vides featuring SUTTON and others.

[3] On May 8, 2020, on the E4DMeecho Facebook Account, the defendant posted "We don't condone no Rats over here My G." A "rat" is a person who provides information about criminal activity to law enforcement and, accordingly, in this post the defendant was warning others against cooperating with law enforcement.

5

20, 2020, on a posting on the "E4DMeecho" Facebook account, the defendant referred to another Facebook user as "ape," which is a term used by members of the Gorilla Stone Bloods to refer to each other.

The defendant is also a member of a gang the identity of which is based on its members' residence in an area of East New York known as "the Bamaz," i.e., the area bounded by Pennsylvania Avenue to the east, Williams Avenue to the west, Dumont Avenue to the south and Sutter Avenue to the north. For example, on May 14, 2018, on the E4DMeecho Facebook Account, the defendant posted the following message: "Opps: 'Yo You From Bamaz?' BAMAZ: CRACKKKK🤐.'"[4] In a further example, the defendant posted a Facebook "live" video on May 24, 2020, in which the defendant spoke to the camera while watching a rap video for the song "Big Opps America," which features, among others, rappers "KJ Balla" and "Elz Tay."[5] In the video, rapper "Elz Tay" refers to "Bama" and says at the end of his verse "Bama always on the go / Bama always on the go." At the end of the Facebook "live" video posted on the defendant's account, the defendant said "East New York, nigga, you already know the fuckin' vibes. Bama life [unintelligible]." On May 31, 2020, a YouTube "channel" called "Meet the Connect TV" posted a video for the song "Crime Rate" by Brooklyn rappers "Bk Eaz" and "Billy DntShootEm." The defendant appears in the video and the opening screen indicates that it is "presented" by "Bamalife." The song features lyrics intended to threaten rival gangs ("we boostin' the crime rate . . . that's word to my mother / when I catch me a opp I'm'a violate"), and at the 2:09 mark, the rapper "Billy DntShootEm" refers to the defendant and his role in gang-related violence when he says "Meecho say get him / I got him."[6]

    ii.   The August 11, 2019 Shooting

On August 11, 2019, at approximately 3:51 a.m. in the vicinity of 20 Williams Avenue, near the border of the Brownsville and East New York neighborhoods in Brooklyn, New York, the defendant shot a member of the rival "Weez Gang," also known as the "Very Crispy Gangsters" or "VCG." The defendant also hit a bystander who was in the area of the shooting. The shooting took place a short distance from a rental hall located at 2529 Atlantic Avenue that was hosting a party that night (the "Hall").

---

[4]    "Opps" is a term used by gang members to refer to members of rival gangs, i.e., the "opposition."

[5]    The rapper "KJ Balla" was murdered in East New York on May 22, 2020.

[6]    In the video, as "Billy DntShootEm" says the lines referring to "Meecho," the defendant appears in the video. The defendant makes a hand gesture at the camera intended to mimic shooting a firearm and then a gang sign known as "dropping a rake," which indicates opposition to and a rivalry with the Folk Nation street gang. "Bk Eaz" and "Billy DntShootEm" are Facebook "friends" of the defendant through the defendant's E4DMeecho Facebook Account.

Surveillance video shows the defendant arriving at the Hall around 11:38 p.m. with four other individuals.[7] He was wearing a white du-rag on his head, a white tank top t-shirt, light colored jeans with a dark colored belt and white athletic shoes. His jeans were sitting low on his waist and what appear to be dark colored underwear are visible above his jeans and below his t-shirt. He was wearing a thin chain with a circular pendant around his neck. Four male individuals accompanied the defendant into the Hall. The victim arrived at the Hall at approximately 2:31 a.m. with two other individuals. The victim and another individual left the Hall at approximately 3:40 a.m. and the defendant and his group left at approximately 3:48 a.m.

A few minutes after the defendant left the Hall, the defendant and the victim had a confrontation on Williams Avenue, just around the corner from the Hall. In the video, the defendant can be seen acting in an agitated manner and it appears that two of the individuals he was with tried to calm him down. Witnesses to the shooting informed NYPD detectives that the shooter asked the victim in substance and in part "you Weezy [sic] Gang?" The witnesses told detectives that the shooter then removed a handgun from his waistband and began shooting at the victim.

The surveillance video shows that, during the confrontation, the individual who left the Hall with the victim suddenly began to run on Williams Avenue towards East New York Avenue. The victim also began backing up and then turned to run towards East New York Avenue. The defendant can then be seen in the video with a firearm in his left hand. He raised his left arm to shoulder height and fired at least two shots at the victim. The victim attempted to jump between cars, but became stuck and fell onto Williams Avenue. The defendant closed in on the victim while the victim was struggling to get to his feet, and the defendant reached over a car parked along the curb and fired at least two more shots at the victim. The shooting occurred at approximately 3:51 p.m. The defendant and his group fled the scene in an SUV parked nearby.

---

[7] Data seized pursuant to a warrant on Facebook accounts associated with the defendant confirms that the defendant was present at the Hall for the party late on August 10, 2019 and early on August 11, 2019. Specifically, at 2:55 a.m., another Facebook user sent a message to the defendant asking "wyaaaa" — a form of the common shorthand for "where you at." The defendant replied about 20 seconds later by sending the other Facebook user the address of the Hall, "2529 Atlantic [A]ve. At 2:56 a.m, the other user asked "u still there," to which the defendant replied "Yeah."



Approximately nine minutes after the shooting, at 4:00 a.m., surveillance video shows the defendant entering 333 Georgia Avenue (i.e., his residence) wearing the same clothes and jewelry he had on at the time of the shooting.[8] According to Google Maps, the driving distance between 20 Williams Avenue — where the shooting occurred — and 333 Georgia Avenue is between 1.4 and 1.9 miles, and between 7 and 10 minutes, depending on the route.

Officers of the NYPD responded to the vicinity of 20 Williams Avenue shortly after the shooting and recovered three .380 auto caliber shell casings from the scene. The NYPD Police Laboratory has analyzed the shell casings and determined that two of the cartridges were manufactured by Remington-Peters and one was manufactured by Prvi Partizan. The NYPD Police Laboratory has determined that the two Remington-Peters shell casings were fired from the same gun, but the lab could not determine whether the Prvi Partizan cartridge was fired from the same gun as the two Remington-Peters shell casings.

---

[8] Data seized pursuant to a warrant for social media accounts associated with Sutton includes six photographs sent by another Facebook user to Sutton's Facebook account on August 14, 2019, i.e., four days after the shooting described above. Each of the photographs shows Sutton with the same close-cropped hair cut he had at the time of the shooting and a thin chain and circular pendant that appears to be the same one he wore at the time of the shooting.

The defendant's statements to the victim just prior to the shooting make clear that this incident was gang related.[9] This shooting was one incident in a long running and violent rivalry between Weez Gang/VCG and the gang comprised of individuals who live within "the Bamaz." First, as set forth above, data seized pursuant to a search warrant on social media accounts associated with the defendant establishes that the defendant is a member of Bloods and the gang associated with "the Bamaz." Moreover, data seized from another one of the defendant's Facebook accounts contains a series of messages from March 2017 in which the defendant described being assaulted and cut by members of "weezgang," and one of the defendant's associates acknowledged the likelihood of revenge.[10]

### iii. The May 16, 2020 Shooting

On May 16, 2020 at approximately 2:24 a.m., the defendant shot and seriously injured an individual in the courtyard of 2211 Pitkin Avenue in Brooklyn, New York. The defendant was arrested by the NYPD and charged by the Kings County District Attorney's Office with the New York State offense of attempted murder for this incident. He was released on his own recognizance shortly after his arrest.

Surveillance video from the lobby of 2211 Pitkin Avenue shows the defendant enter the lobby wearing black sweatpants with a white logo on the left leg over the mid-thigh, athletic shoes with white uppers, black soles and black laces, and a sweatshirt with a white body and a black hood. As the defendant passed through the vestibule of the building, he had what appears to be a firearm with an extended clip in his left hand. The defendant paused in the lobby, looked briefly up a short flight of stairs in front of him, then turned and ran back out of the building through the front door. Approximately one minute later, ShotSpotter, a company that has installed microphones in Brooklyn, New York, to record and identify gun shots as they occur, recorded several gun shots at this location. At the same time, an individual who was standing in the courtyard of 2211 Pitkin was shot several times. He suffered serious injuries and was transported to Brookdale Hospital where he eventually recovered and was discharged.

---

[9] According to law enforcement, the victim, who was subsequently murdered on June 5, 2020 in East New York, was believed to be a member or associate of Weez Gang/VCG.

[10] On March 27, 2017 at approximately 1:46 p.m., a Facebook user with username "Shay Crippy" sent Sutton a message asking "U Good Money? Whoo Fronted? [sic]" Sutton responded approximately one minute later, "Some weezgang niggas." At 2:03 p.m., Sutton boasted that he did not run from the attack because "They pussy no sense of running." At 4:07 p.m., "Shay Crippy" responded "Damnn Broo We Both Knoo Da Get Bacc Gonna Be Litty." In this exchange, "Shay Crippy" contacted Sutton to find out who had attacked him ("Whoo Fronted?") and Sutton explained that it was members of "weezgang," but that he did not run because he was not afraid of them ("They pussy"). "Shay Crippy" responded by stating that revenge on the "weezgang" members ("Da Get Bacc") would be severe ("Gonna Be Litty").

9

Two NYPD officers who were in the vicinity of 2211 Pitkin Avenue at the time of the shooting heard the shots and approached 2211 Pitkin Avenue. They observed a Black male, approximately 5'6", slim build in his mid-20s wearing a white hooded sweatshirt, athletic shoes and black pants fleeing from the scene. The officers chased the individual but he was able to escape, at which time the officers returned to the scene and discovered the victim with gunshot wounds. Officers of the NYPD recovered six 9mm shell casings and two bullet fragments from the scene of the shooting. The NYPD Police Laboratory has analyzed the shell casings and determined that all six were fired from the same firearm. The NYPD Police Laboratory has also analyzed the two bullet fragments and determined that they were fired from the same gun.

Approximately two hours prior to the shooting, law enforcement officers who were responding to a report of gunshots in the vicinity of 405 Georgia Avenue spoke to the defendant as he passed by on the street. Their interaction was captured by a surveillance camera in the area, and it confirms the law enforcement officers' recollection that the defendant was wearing the same pants and shoes that he was later wearing when, as recorded by the surveillance video, he shot the victim at 2211 Pitkin Avenue. The shoes the defendant was wearing during his interaction with law enforcement and at the time of the shooting were seized from the defendant's apartment pursuant to a judicially authorized search warrant on July 23, 2020.

As noted above, in connection with this shooting, the defendant was arrested and charged with the New York State offense of attempted second degree murder, in violation of N.Y.P.L. §§ 125.25 and 110.00. He was released on his own recognizance later the same day that he was arrested.

    iv.   The July 13–14, 2020 Shootings

On July 13, 2020 and 14, 2020, the defendant and others committed three drive-by shootings in Brooklyn using a red 2018 Honda Accord with New York license plate JKY8600 (the "Red Honda") and a white Infiniti SUV. The Red Honda was subsequently recovered by law enforcement and, pursuant to a judicially authorized search warrant, the defendant's fingerprints were found on the interior of the rear driver's side door.

On July 13, 2020, at approximately 4:11 p.m., the Red Honda, the white Infiniti SUV and a red SUV were involved in a drive-by shooting on Bristol Street, in Brooklyn, New York. Two NYPD officers on patrol observed an individual fire shots from the window of one of the vehicles. Video surveillance revealed that the shots were fired from the white Infiniti SUV. An individual who had been in the vicinity of 341 Bristol Street was shot in the leg.

The Folk Nation gang is active in the area of Brooklyn in which 341 Bristol Street is located. Further, officers who responded to the scene of the shooting observed an individual whose identity is known to them in the vicinity of the victim. The individual is

10

known to the NYPD as a member of the Hoolie Gang, which is a criminal gang consisting of members of both the Bloods and Folk Nation gangs.[11]

On July 14, 2020, at approximately 7:26 p.m., surveillance video shows the Red Honda, the white Infiniti SUV and a red SUV pull to the side of the road in front of 927 DeKalb Avenue. Approximately five men exited the Red Honda and the white SUV and ran towards 927 DeKalb Avenue. The red SUV stopped briefly behind the white Infiniti SUV, then went around the two cars and continued down the street. The men then ran back into the Red Honda and the white SUV, which drove away together. At approximately the same time, ShotSpotter, a company that has installed microphones in Brooklyn, New York, to record and identify gunshots as they occur, recorded several gunshots at this location. When NYPD officers responded to the scene, they found an individual shot in the abdomen.

On July 14, 2020, shortly after 8 p.m., a witness was working as an Uber driver in the vicinity of 620 Vermont Street in Brooklyn, New York. The witness was parked in front of 614 Vermont Street, facing north towards Livonia Avenue. The witness's Uber vehicle was equipped with a video camera on the dashboard, facing forward, through the front windshield.

The video captured by the witness's camera shows that, at approximately 8:07 pm, the Red Honda pulled up approximately five or six feet in front of and to the right of the witness's vehicle. As the Red Honda came to a stop, one individual got out from the rear passenger's side door with a firearm clearly visible in his right hand. An individual who appears to be the defendant exited from the rear driver's side door with a firearm clearly visible in his left hand. The defendant and the other individual raised their firearms to shoulder height and began firing and running towards a target behind and to the left of the witness's Uber vehicle. The video shows that, as the defendant exited the Red Honda, he opened the rear driver's side door by pushing on the interior of the door, i.e., the location where law enforcement subsequently found his fingerprints pursuant to a judicially authorized search of the Red Honda.

While the defendant and the other assailant were out of the camera's view, the Red Honda pulled up approximately two car lengths and a white Infiniti SUV pulled up beside the witness's Uber vehicle. The video shows an individual inside the Infiniti SUV with a firearm in his hand lean across the back seat and push open the rear driver's side door. The individual who exited from the rear passenger's side door of the Red Honda can then be seen running back to the Red Honda and getting in the same door from which he exited. Two more individuals then ran up beside the witness's Uber vehicle and jumped into the rear driver's side door of the white Infiniti SUV. The defendant ran between the Uber vehicle and the Infiniti

---

[11] At the 1:13 mark of the "Crime Rate" video, described above, the rapper "Billy DntShootEm" raps "I fuck with my Bloods with a passion / I fuck with the loccs get it crackin' / put Folk niggas' in caskets / bodies on bodies we're stackin' / Hoolie niggas' is rats / they gettin' clapped."

SUV and, with the firearm still visible in his left hand, he got back into the Red Honda and pulled the door closed. Both cars sped away from the scene.

An individual who was standing in the vicinity of 620 Vermont Street was shot five times in the back. The victim is known to law enforcement as a member of Weez Gang/VCG, and he was indicted by the Kings County District Attorney's Office in 2012 in connection with a violent dispute between Weez Gang/VCG and a rival gang known as the Rockstarz, the latter of which is aligned with "the Bamaz."[12]

### c. The Defendant's Acts of Domestic Violence

The defendant also has a history of violence against women. According to NYPD reports, on March 26, 2014, the defendant assaulted a woman with whom he attended high school. After the two had an argument in school, the defendant waited for her and assaulted her by punching both sides of her face, breaking her teeth. The assault was recorded on one of the school's video cameras. In connection with this assault, the defendant pleaded guilty to second degree assault with intent to cause serious physical injury, in violation of New York Penal Law § 120.05(01), a class D felony. He was sentenced to two years' imprisonment.

The government has reviewed evidence pursuant to the Facebook warrant discussed above, which indicates that the defendant has also assaulted the girlfriend with whom he was found and arrested earlier this morning. For example, on April 20, 2020, in a Facebook message, the defendant's girlfriend wrote "[y]ou violated me last night got a mark on my face and all but you don't care about that and how you treat me." On April 22, 2020, in a Facebook message, the defendant accused his girlfriend of "be[ing] in a car with a whole old ass man that you dont know." His girlfriend responded by saying that the defendant "hit me like you was hitting a nigga like you don't care." On May 16, 2020, the defendant's girlfriend sent him several pictures showing an abrasion on her lip. On May 17, 2020, the defendant wrote to her, "I didn't mean to buss your lip or anything you wasnt tryna give me space."

According to police reports, on July 21, 2020 at approximately 2:45 a.m. the defendant went to the home of his girlfriend — the location at which he was arrested this morning — and knocked on the door. The woman's father answered the door and the defendant demanded to come in. When the woman's father refused the defendant entry to the apartment, the defendant pushed the father out of the way, went to his girlfriend's room and took her iPhone. On the way out of the apartment, Sutton threatened to kill the woman's father.

---

[12] At the 1:02 mark in the video for "Crime Rate," described above, the rapper "Billy DntShootEm" raps "we gonna catch them standin' on Vermont / dirty niggas still wearing Marmot."

II. <u>Legal Standard</u>

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156, "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" <u>United States v. English</u>, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001).

The government may proceed by proffer to establish facts relevant to a detention determination. <u>United States v. Ferranti</u>, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." <u>Id.</u> at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See <u>United States v. LaFontaine</u>, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." <u>United States v. Acevedo-Ramos</u>, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in <u>LaFontaine</u>, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. <u>Id.</u>

<u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant. <u>See</u> 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" <u>United States v. Millan</u>, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III.    <u>Argument</u>

       The defendant is a significant danger to the community and a flight risk, and the factors set forth in 18 U.S.C. § 3142(g) weigh heavily in favor of detention. First, the instant offense is a crime of violence and it "involves a . . . firearm." 18 U.S.C. § 3142(g).[13] The defendant, a member of the Bloods and a violent gang associated with "the Bamaz," shot and tried to kill an individual in broad daylight on a Brooklyn street. There can be no serious dispute that the facts underlying the defendant's crime are extraordinarily serious.[14]

       The defendant's history and characteristics also weigh heavily in favor of detention. The defendant is extraordinarily violent by any measure and he has shown total disregard for the lives of others. He has a been involved in at least five additional shootings in the past year, including at least four in the last six weeks, and three that he committed after being arrested and charged with the New York State offense of attempted murder in connection with the May 16, 2020 shooting. The defendant's violent spree over the last year has left at least seven individuals with gunshot wounds. That these events did not lead to seven deaths is entirely fortuitous — the videos described above make clear that the defendant shoots to kill. Beyond the defendant's involvement in this gang-related violence, he also has a history of violence against women that would, even in the absence of the defendant's gang-related violence, strongly weigh in favor of detention.[15]

       There is no question that the defendant's release would pose a serious danger to the community. He is an active gang member who is engaged in ongoing, violent gang disputes that are likely to erupt in further violence. His arrest in connection with the May 16, 2020 shooting described above has done nothing to dissuade the defendant from attempting to kill rival gang members and there is nothing in the record to suggest that this arrest will deter him.

       Finally, the evidence against the defendant is strong. The shooting underlying the current charge is captured on video and surveillance videos from the hours before the shooting show the defendant in the vicinity of the shooting wearing the same clothing as the shooter. Further, images posted on Facebook show the defendant just a few weeks before the shooting wearing the same fleece or sweatshirt as the shooter. Finally, on July 23, 2020, pursuant to a judicially authorized search, the government seized eight rounds of ammunition

---

[13]    See <u>United States v. Watkins</u>, 940 F.3d 152, 163 (2d Cir. 2019) ("It has long been the law of our Circuit that possession of a firearm is unequivocally a crime of violence for purposes of § 3142(f)(1)(A).").

[14]    See <u>United States v. Dillard</u>, 214 F.3d 88, 94 (2d Cir. 2000) ("The risk of violent use posed by a convicted felon's possession of firearms is significant.").

[15]    Cf. <u>United States v. Mercedes</u>, 254 F.3d 433, 437 (2d Cir. 2001) (noting that, although the defendant had no prior criminal history, his "history of domestic violence" weighed in favor of detention).

14

and two items of clothing that the defendant changed into after the shooting in an effort to avoid detection by police who were responding to the scene.

In addition to the danger the defendant poses to the community, he is also a significant flight risk. When law enforcement executed a search warrant on his apartment on July 23, 2020, he was not present. Thereafter, he evaded arrest until NYPD officers located him at his girlfriend's house early this morning. Indeed, on July 26, 2020, the defendant posted a message to his Facebook account indicating that he and many of his friends knew that law enforcement was looking for him.[16]

When officers located the defendant this morning at his girlfriend's apartment, the defendant attempted to flee. While officers were inside the girlfriend's apartment, officers outside the building observed the air conditioning unit in the girlfriend's room begin to move. When officers inside the apartment entered the girlfriend's room to arrest the defendant, they observed him attempting to escape through the first floor window and on to the street.

Between July 23, 2020 and the defendant's arrest this morning, information provided by Facebook indicates that he stayed at several locations and accessed his Facebook account at least once from a prepaid phone with service that began on July 23, 2020. Furthermore, the number of individuals involved in the shootings described above — at least seven other individuals in the July 14, 2020 Vermont Street shooting alone — makes clear that the defendant has a local network of criminal associates who have a significant personal interest in helping him avoid detection, arrest and prosecution.

Finally, given the defendant's obvious intent to murder the victim of the shooting underlying the current charge, the applicable Guidelines range if he is convicted of

---

[16] On July 26, 2020, at 11:21 p.m., the defendant posted a public status update to his Facebook account in which he wrote, "That 'BE SAFE BRO' hit a lil different now." The comment is a reference to an admonition to "be safe" that the defendant and his Facebook friends use to refer to the possibility of gang related violence. For example, on August 9, 2019, Sutton posted a Facebook status update in which he wrote, "You Tell A Hood Nigga 'be safe' He Wanna Be Extra 'Niggas know not to RUN UP.'" This post makes clear that the admonition to "be safe" is intended to remind the listener to be mindful that others might try to attack him (i.e., to "RUN UP"). Accordingly, in the August 9, 2019 post, the defendant was suggesting that some individuals respond to the admonition to "be safe" by vigorously asserting ("He Wanna Be Extra") that enemies or rivals would not dare to attack them ("Niggas know not to RUN UP."). In another example, on November 16, 2019, a Facebook user wrote to Sutton with a message that said, in part, "be safe gangster." In this context, the defendant suggested in his July 27, 2020 post that the admonition to "be safe" has taken on a different meaning ("hits a lil different") because he and the audience for his Facebook status update were aware that law enforcement was actively looking for him.

15

the current charge will be the statutory maximum of 10 years' imprisonment.[17] The likelihood that the defendant will serve a lengthy term of imprisonment enhances the already significant risk that the defendant will flee, and weighs heavily in favor of detention.[18]

IV. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendant's return to court if the defendant is released on bail, and therefore requests that the Court order that the defendant be detained pending trial.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/
Kevin Trowel
Jonathan Siegel
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (by ECF)

---

[17] The applicable Guidelines provision is U.S.S.G. § 2K2.1, which in turn contains a cross reference for cases where, as here, "the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense," id. § 2K2.1(c)(1). Because the defendant possessed ammunition in the course of an attempted first-degree murder, his base offense level will be 43, see id. § 2A1.1(a), App. Note 1 ("This guideline applies in cases of premeditated killing."); § 2X1.1(b)(1) ("If an attempt, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense. . . ." (emphasis added)). In light of this Guidelines calculation, the applicable Guidelines range for the offense alleged in the complaint will be the statutory maximum of 120 months' imprisonment.

[18] See, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87–108 months' imprisonment was significant enough to provide an incentive to flee"); see also United States v. Blanco, 570 F. App'x 76, 77 (2d Cir. 2014) (affirming district court's order of detention because, inter alia, defendant "face[d] a mandatory minimum prison sentence of five years, a possible maximum sentence of 40 years").